UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
M.M. on behalf of herself individually,
and her child,                                                                    15 Civ. 5846 (PKC)

                                        Plaintiff,

            -against-                                                              MEMORANDUM
                                                                                  AND ORDER

NEW YORK CITY DEPARTMENT OF
EDUCATION, et al.,

                                        Defendants.
----------------------------------------------------------------x
CASTEL, U.S.D.J.

           Plaintiff, M.M., brings this action in her individual capacity, and as a

representative of her child, C.M., against the New York City Department of Education

("DOE"), the New York City Board of Education, and the Chancellor of the New York City

Schools under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400,

et seq., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), 42

U.S.C. § 1983, and New York State law.  Pursuant to previous administrative proceedings, a

State Review Officer ("SRO") awarded C.M. compensatory education as relief for the

defendants' failure to provide C.M. with a free appropriate public education ("FAPE") in

violation of the IDEA.  M.M appeals this award, seeking additional compensatory education

and other relief, and moves for summary judgment.  Defendants cross move for summary

judgment to uphold the amount of compensatory education granted by the SRO and against

all of M.M.'s other claims.

BACKGROUND

I.   The IDEA.

The IDEA requires states that receive federal funding for education to provide students with disabilities a FAPE.  20 U.S.C. § 1412(a)(1)(A).  The services that a school must provide to ensure that a student receives a FAPE are determined by the student's individualized educational program ("IEP'), which is "a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  R.E. v. New York City Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012).  "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  Endrew F. v. Douglas Cty. Sch. Dist. RE-1, No. 15-827, 2017 U.S. LEXIS 2025, at *21 (Mar. 22, 2017).

The determination of whether an IEP is sufficient to meet this standard differs according to the individual circumstances of each student.  See id. at 22.  For a student who is "fully integrated in the regular classroom," an IEP should be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade."  Id. at 23 (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 203-04 (1982)).  For a student not fully integrated in the regular classroom, an IEP must aim for progress that is "appropriately ambitious in light of [the student's] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom.  The goals may differ, but every child should have the chance to meet challenging objectives."  Id. at 25.  This standard is "markedly more demanding" than the one the Court rejected in Endrew F., under

which an IEP was adequate so long as it was calculated  to confer "some educational

benefit," that is, an educational benefit that was "merely" more than "de minimis."  Id. at 17,

26.

In New York, a student's IEP is developed by a committee on special

education ("CSE") that is comprised of parents, teachers, and state representatives.  The

IDEA also requires that states provide parents with an opportunity to object "to any matter

relating to the identification, evaluation, or educational placement of the child, or the

provision of a free appropriate public education to such child."  20 U.S.C. § 1415(b)(6)(A).

To provide parents this opportunity to object, New York has established a

two-tier system of administrative review.  In the first instance, parents who wish to challenge

a student's IEP or placement must file a due process complaint setting forth the basis for the

challenge and requesting an impartial hearing before an Impartial Hearing Officer ("IHO").

See N.Y. Educ. L. § 4404(1); 8 NYCRR § 200.5(i)(1)(IV).  Following the hearing and

determination by the IHO, either party may appeal the decision to a SRO.  See N.Y. Educ. L.

§ 4404(2).  If either party is unsatisfied with the SRO's decision, they may bring a civil

action challenging that decision in federal or state court.  20 U.S.C. § 1415(i)(2)(A); N.Y.

Educ. L. § 4404(3).

The IDEA allows an IHO or SRO to fashion an appropriate remedy for

students not provided a FAPE, and the Second Circuit has held that compensatory education

is an available remedy under the IDEA to make up for denial of a FAPE.  P. ex rel. Mr. and

Mrs. P. v. Newington Bd. of Educ., 546 F.3d 111, 123 (2d Cir. 2008) (upholding

compensatory education awarded by hearing officer).  The award of compensatory education

"must be reasonably calculated to provide the educational benefits that likely would have

accrued from special education services the school district should have supplied in the first place." <u>Doe v. E. Lyme Bd. of Educ.</u>, 790 F.3d 440, 457 (2d Cir. 2015) (qutoing <u>Reid ex rel. Reid v. District of Columbia</u>, 401 F.3d 516, 524 (D.C. Cir. 2005)).

IDEA actions generally are resolved by summary judgment.  <u>See</u>, <u>e.g.</u>, <u>Thies v. New York City Bd. of Educ.</u>, No. 07 cv 2000 (RMB), 2008 U.S. Dist. LEXIS 11354, at *5 (S.D.N.Y. Feb. 4, 2008); <u>J.R. v. Bd. of Educ. of City of Rye Sch. Dist.</u>, 345 F.Supp.2d 386, 394 (S.D.N.Y. 2004).

II.  <u>Factual Record and Procedural History.</u>

Plaintiff M.M. is the parent of C.M., a 10-year-old girl with autism.  (Pl.'s Rule 56.1 Statement of Undisputed Material Facts, October 31, 2015, Dkt. No. 31 ("Pl.'s 56.1") ¶ 2.)

C.M. received early intervention services and thereafter received special education services from defendants through the Committee on Preschool Special Education that included a special education class, as well as 10 hours per week of after-school, home-based individual ("1:1") services using the instructional strategy of Applied Behavioral Analysis ("ABA" or "ABA Services"), and 12-month extended school year ("ESY") services.[1]  (Pl.'s 56.1 ¶ 22.)  C.M. transitioned to defendants' CSE for the 2010-2011 SY, at which time she entered kindergarten.  (Pl.'s 56.1 ¶ 23.)

M.M alleges that the IEP that the CSE offered to C.M. for the 2010-2011 SY did not include 1:1 home-based ABA or ESY services.  (Pl.'s 56.1 ¶ 24.)  M.M.M. filed a due process complaint and C.M. received 1:1 home-based ABA services pursuant to a pendency

---

[1] "Some children with disabilities need educational services not only during the regular school year, but over the summer as well.  An IEP may therefore provide for a full twelve-month educational program that includes regular school-year services as well as ESY services over the summer."  <u>T.M. v. Cornwall Cent. Sch. Dist.</u>, 752 F.3d 145, 152 (2d Cir. 2014).

order.  (Pl.'s 56.1 ¶ 25.)  M.M. alleges that the IHO ruled in M.M.'s favor on the merits of her complaint, finding that C.M. had been denied a FAPE.  (Pl.'s 56.1 ¶ 25.)

For the 2011-2012 SY, C.M. transferred to community school P.S. 234Q, which she currently attends.  (Pl.'s 56.1 ¶ 27.)  For the 2011-2012 SY, defendants offered another IEP without 1:1 teaching services, home-based services, ABA, or ESY services.  (Pl.'s 56.1 ¶ 26.)  M.M. filed another due process complaint and an IHO ruled in her favor.  (Pl.'s 56.1 ¶ 26.)  In the IHO's Findings of Fact and Decision issued on March 15, 2012 (the "March 2012 Decision"), the IHO directed the defendants to modify C.M.'s IEP to include a 12-month program and home-based ABA services for 10 hours per week at a rate of $102 per hour.  (Pl.'s 56.1 ¶ 28.)

Defendants developed a May 2012 IEP, which was amended June 22, 2012, and included the services ordered by the IHO in the March 2012 Decision.  (Pl.'s 56.1 ¶ 29.) M.M. filed a due process complaint challenging this IEP, and on August 22, 2012, IHO De Leon issued an order (the "August 2012 Order"), directing defendants to provide C.M. with 10 hours per week of 1:1 home-based ABA for the 2012-2013 SY at $102 per hour, as well as other services contained in the 2012 IEP.  (Pl.'s 56.1 ¶¶ 30, 32.)  IHO De Leon ruled that M.M. could file a new due process complaint concerning claims that she had not previously raised.  (Pl.'s 56.1 ¶ 33.)  M.M. filed another due process complaint for the 2012-2013 SY.  (Pl.'s 56.1 ¶ 34.)  The matter resulted in a Stipulation of Settlement and Agreement (the "Stipulation") between M.M. and defendants dated May 30, 2013.  (Pl.'s 56.1 ¶ 35.)

Pursuant to the Stipulation, separate and apart from the 10 hours per week of home-based ABA, defendants agreed to fund 690 hours of ABA Services (the "ABA Bank") and independent assistive technology as well as speech and language evaluations.  (Pl.'s 56.1

¶ 36.)  C.M.'s compensatory ABA Bank went into effect on July 1, 2013, and continued until June 30, 2014.  (Pl.'s 56.1 ¶ 37.)

On June 12, 2013, defendants conducted an IEP review for the 2013-2014 SY. (Pl.'s 56.1 ¶ 42.)  The 2013 IEP did not include any ABA Services, home-based services, or 1:1 special education teacher services.  (Pl.'s 56.1 ¶ 44.)  This IEP recommended that C.M. attend a class with a 12:1:1 student-teacher-paraprofessional ratio in a community school with related services and receive 12-month ESY services in a DOE Specialized School. (Pl.'s 56.1 ¶ 45.)  Defendants stopped funding C.M.'s home-based ABA services on June 30, 2013.  (Pl.'s 56.1 ¶ 46.)

A.    M.M.'s Due Process Complaint and Hearing.

On July 11, 2013, M.M. filed a due process complaint ("2013 Due Process Complaint") under the IDEA alleging that the DOE failed to provide C.M. with a FAPE for the 2013-2014 SY, improperly denied her 1:1 instruction, ABA Services, home-based services, and violated her right to education in the least restrictive environment ("LRE"). (Pl.'s 56.1 ¶ 6.)  M.M. also brought claims under Section 504 and section 1983 spanning multiple years.  (Pl.'s 56.1 ¶ 8.)  M.M. sought various forms of relief, including independent educational evaluations ("IEEs"), compensatory education, assistive technology, declaratory rulings concerning FAPE and the other claims raised in the 2013 Due Process Complaint, and a legally valid IEP containing the last agreed upon services, as well as additional services.  (Pl.'s 56.1 ¶ 9.)

On August 15, 2013, a pendency hearing was held before IHO Roth to determine C.M.'s stay-put program and placement.  (Pl.'s 56.1 ¶ 48.)  On September 27, 2013, IHO Roth issued an Interim Order on Pendency ("2013 IOP").  (Pl.'s 56.1 ¶ 49.)  IHO

Roth found in the 2013 IOP that the June 2012 IEP constituted C.M.'s stay-put placement for the 2013-2014 SY. (Pl.'s 56.1 ¶ 55.) IHO Roth, pursuant to the 2013 IOP, directed the defendants to fund the 10 hours per week of [Special Education Itinerant Teacher ("SEIT")]/ABA included on the June 2012 IEP. (Pl.'s 56.1 ¶ 56.) Neither party appealed the 2013 IOP. (Pl.'s 56.1 ¶ 57.)

As a result, during the 2013-2014 SY, and while the hearing on the 2013 Due Process Complaint was pending, C.M. received a total of 25 hours per week of 1:1 ABA Services: 10 hours per week via C.M.'s right to pendency and 15 hours per week from the ABA Bank. (Pl.'s 56.1 ¶ 72.)

On November 7, 2013, IHO Roth held a hearing on M.M.'s challenge to C.M.'s 2013 IEP. (See Pl.'s 56.1 ¶ 58.) IHO Roth ruled that she had no jurisdiction over policies and procedures. (Pl.'s 56.1 ¶ 59.) IHO Roth then recused herself at the request of M.M.'s counsel. (Pl.'s 56.1 ¶ 60.) Proceedings resumed before IHO De Leon at a hearing held on April 8, 2014. (Pl.'s 56.1 ¶ 61.)

At the April 8, 2014 hearing, both parties proposed evidence on the record. (Pl.'s 56.1 ¶ 62.) Defendants conceded that they had failed to provide C.M. a FAPE and did not call any witnesses. (Pl.'s 56.1 ¶ 10.) Defendants argued that C.M. was not entitled to compensatory education for defendants' failure to provider her a FAPE because C.M. had made progress during the 2013-2014 SY with the ABA hours from the ABA Bank and the pendency services that she received pursuant to her stay-put placement. (Pl.'s 56.1 ¶ 73.)

At the hearing, M.M. called four witnesses, including herself. (Pl.'s 56.1 ¶ 85.) Some of M.M.'s witnesses were designated as experts by the IHO. (Pl.'s 56.1 ¶ 90, 117, 155.) These experts testified extensively based on their observations of C.M.,

interviews with C.M.'s teachers, and a review of C.M.'s records.  (See Pl.'s 56.1 ¶¶ 86-123, 152-59.)  They testified regarding C.M.'s disabilities, how those disabilities affected her education, and made recommendations for C.M.'s future educational needs.  (See Pl.'s 56.1 ¶¶ 86-123, 152-59.)  M.M. testified regarding C.M.'s disabilities and C.M.'s behavior away from school and described the past educational services C.M. had received.  (See Pl.'s 56.1 ¶¶ 124-51.)  The IHO denied M.M.'s request to admit the report and testimony of Dr. Cecelia McCarton, who conducted a neurodevelopmental evaluation of C.M. on the grounds that such evidence was cumulative and would cause delay.  (Pl.'s 56.1 ¶¶ 162-64)

The IHO denied M.M.'s requested relief for the 2013-2014 SY as moot and denied M.M's request for compensatory education on the merits, but ruled in favor of C.M. to the extent that he ordered defendants to reimburse M.M. for the cost of C.M.'s neurodevelopmental/psychological evaluation and that the CSE reconvene to produce a new IEP for the remainder of the 2014-2015 SY.  (Findings of Fact and Decision, November 21, 2014, Case No. 145526 ("IHO Dec.") at 18.)  The IHO did not issue a declaration or ruling as to what set of services and placement constituted C.M.'s last agreed upon placement following the decision, (Pl.'s 56.1 ¶ 174), and did not order that C.M.'s 10 hours per week of ABA Services remain a part of her last agreed-upon program, (Pl.'s 56.1 ¶ 175.)

M.M. filed a partial appeal of the IHO decision to the SRO.  (Pl.'s 56.1 ¶ 184.)  Defendants submitted an Answer, but did not cross-appeal.  (Pl.'s 56.1 ¶ 13.)

B.    SRO Decision.

The SRO found that the district, rather than M.M., had the burden of proof on the contested issues at the impartial hearing.  (SRO Decision, No. 14-179, March 26, 2015 ("SRO Dec.") at 7.)  The SRO found that:

> Although the IHO stated during the impartial hearing that the
> parent had the burden of proving that the compensatory
> educational services sought for the student were appropriate,
> the IHO's decision reflected an appropriate analysis of the
> factors that go into determining whether an award of
> compensatory services is warranted, as did other comments he
> made during the hearing.

(Id.)  The SRO went on to state that even assuming that the IHO had misapplied the burden

of proof, the SRO's decision was based on an independent examination of the hearing record.

 (Id.)

The SRO rejected M.M.'s argument that the IHO improperly restricted the

scope or content of questioning witnesses.  (Id. at 8.)  The SRO upheld the IHO's conclusion

that M.M.'s claim seeking modification of C.M.'s IEP for the 2013-2014 SY was moot, but

found that the appeal was not moot in its entirety because there was still an ongoing

controversy over compensatory education.  (Id. at 9.)  The SRO awarded 24 hours of

compensatory additional parent counseling and training, to be used by October 31, 2015, (id.

at 11), and directed the district to provide 1 hour of compensatory 1:1 ABA services for each

day in the 2013-2014 12-month school year, for a total of 210 hours, to be used by October

31, 2015, (id. at 13).  The ABA award included the 180 day school year and 30 days during

the summer portion of the 12-month school year.  (Id. at 13 n.13.)  The SRO declined to

award M.M.'s request to provide C.M. with ESY services every week of the year, even

during summer months in which school was not in session.  (See id.)  The SRO denied

M.M.'s request for assistive technology services as a component of the compensatory

education award.  (Id. at 10-11 n.9.)  The SRO further ordered:

> [W]hen the CSE next convenes to conduct an annual review of
> the student's program the district will be directed to consider
> whether home-based educational services, the provision of
> instruction using ABA methodology, or assistive technology

> devices and services are required to enable the student to
> benefit from instruction and, after due consideration thereof,
> provide the parent with prior written notice on the form
> prescribed by the Commissioner specifically indicating
> whether the CSE recommended or refused to recommend such
> services on the student's IEP and explaining the basis for the
> CSE's recommendation therein as well as the evaluative
> information relied upon in reaching these determinations.

(Id. at 14.)  M.M. appeals the compensatory education awarded by the SRO, alleging that the

award was insufficient to remedy defendants' failure to provide C.M. with a FAPE, and

further appeals other claims not decided by the SRO or IHO.

LEGAL STANDARD

      "[A] motion for summary judgment in an IDEA case often triggers more than

an inquiry into possible disputed issues of fact.  Rather, the motion serves as a pragmatic

procedural mechanism for reviewing a state's compliance with the procedures set forth in

IDEA and determining whether the challenged IEP is reasonably calculated to enable the

child to receive educational benefits."  Lillbask ex rel. Mauclaire v. State of Conn. Dep't of

Educ., 397 F.3d 77, 83 n.3 (2d Cir 2005) (internal quotation marks omitted).  Unlike with an

ordinary summary judgment motion, the existence of a disputed issue of material fact will

not necessarily defeat a motion for summary judgment in the IDEA context.  See, e.g., T.P.

ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009) (per

curiam); Viola v. Arlington Central Sch. Dist., 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).

      A district court "must engage in an independent review of the administrative

record and make a determination based on a preponderance of the evidence."  M.H. v. New

York City Dep't of Educ., 685 F.3d 217, 240 (2d Cir. 2012) (quoting Gagliardo v. Arlington

Central Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007)).  "'The role of the federal courts in

reviewing state educational decisions under the IDEA is circumscribed,' however, and

'courts must bear in mind the statutory context and administrative judges' greater institutional competence in matters of educational policy.'" Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist., 773 F.3d 372, 386 (2d Cir. 2014) (quoting R.E., 694 F.3d at 189). Federal courts "must give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Id. (quoting M.H., 685 F.3d at 240); accord R.E., 694 F.3d at 189 ("courts must bear in mind the statutory context and the administrative judges' greater institutional competence in matters of educational policy" and "must defer to the SRO's decision on matters requiring educational expertise").

"District courts are not to make 'subjective credibility assessment[s],' and cannot 'ch[oose] between the views of conflicting experts on . . . controversial issue[s] of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence.'" M.H., 685 F.3d at 240 (alterations and omissions in original) (quoting Grim v. Rhinebeck Central Sch. Dist., 346 F.3d 377, 383 (2d Cir. 2003)).

"[T]he deference owed to an SRO's decision depends on the quality of that opinion." R.E., 694 F.3d at 190. "Courts generally 'defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer.'" M.H., 685 F.3d at 241 (quoting A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 171 (2d Cir. 2009)). "Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful." Id. (quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998)).

In determining the weight to afford an SRO decision, a district court also considers the decision-maker's familiarity with the evidence, including witnesses. Hardison,

773 F.3d at 386.  When the IHO and SRO reach conflicting conclusions, the courts generally

defer to the SRO as the final state decision-making authority.  Id.

DISCUSSION

The SRO's decision was thorough and well-reasoned, and is thus entitled to

deference.  M.H., 685 F.3d at 241.  The Court must determine whether the compensatory

education awarded by the SRO is "reasonably calculated to provide the educational benefits

that likely would have accrued from special education services the school district should

have supplied in the first place."  E. Lyme Bd. of Educ., 790 F.3d at 457 (quoting Reid, 401

F.3d at 524).  This determination is at heart a matter of education methodology, an area

which the SRO has expertise the Court lacks.  See id.  Thus, "district court[s] must defer to

administrative determinations involving educational methodology. . . ."  M.H., 685 F.3d at

243.  Under these circumstances, overturning the SRO's well-reasoned decision would

improperly "substitute [the Court's] own notions of sound educational policy for those of the

school authorities which [it] review[s]."  Id. at 240 (quoting Rowley, 458 U.S. at 206).

Defendants' motion for summary judgment is thus granted with respect to M.M's appeal of

the SRO's award of compensatory education, and M.M.'s motion is denied to that extent.

M.M. also brings claims under the Section 504 and section 1983 premised on

C.M.'s deprivation of a FAPE; claims under the IDEA, Section 504, and section 1983

alleging systemic violations of the IDEA; and claims under New York state law.  Some of

these claims were raised at the impartial hearing and on appeal to the SRO, but were not

decided.  To the extent that the SRO made findings relevant to these claims the Court will

defer to the SRO's findings, for the reasons stated above.  To the extent that the SRO did not

make findings relevant to these claims, or which the lack of discovery or failure to develop

the administrative record would make evaluating M.M.'s claims based on a summary

judgment standard inappropriate, the Court evaluates the parties' motions for summary

judgment using the same standard as it would use to evaluate a motion to dismiss under Rule

12(b)(6), Fed. R. Civ. P.  Because M.M. has failed to state a claim upon which relief could be

granted under Section 504 or section 1983 for defendants' failure to provide C.M. with a

FAPE, or for systemic violations of the IDEA under that statute, Section 504, or section

1983, or under New York State law, M.M.'s motion for summary judgment is denied and

defendants' motion for summary judgment is granted with respect to those claims.

　　　　M.M. also brings claims under the IDEA alleging that C.M.'s stay-put rights

were violated and that defendants failed to implement the SRO order.  Due to an

inadequately developed record, the Court denies both parties' summary judgement motions

with respect to these claims.

I.　Evidentiary Rulings.

　　　　The IHO denied M.M.'s request to admit the report and testimony of Dr.

Cecelia McCarton, who conducted a neurodevelopmental evaluation of C.M.  (See Pl.'s 56.1

¶¶ 162-64.)  The IHO ruled that such evidence was cumulative and would cause delay.  (See

Pl.'s 56.1 ¶ 164.)  M.M. included the McCarton Report in the supplemental evidence she

provided to the SRO on appeal.  (See SRO Dec. at 8.)  The SRO found that the report, among

other supplemental evidence submitted by M.M., was "not necessary to a determination on

the issue of compensatory relief," and, in any event, that M.M. did not assert that the IHO

abused his discretion by not admitting the evidence.  (See id. at 9.)

　　　　M.M. argues that "[t]he record did not contain any other neuro-developmental

testing, report or testimony from a physician (Dr. McCarton is a Professor of Clinical

13

Pediatrics) and no report contained identical diagnosis or recommendations." (Pl.'s Reply Mem. in Further Supp. and Opp. of Summ. J., September 20, 2016, Dkt. No. 79 ("Pl.'s Opp.") at 12.) However, testimony from multiple experts was admitted at the impartial hearing. (Pl.'s 56.1 ¶ 90, 117, 155.) Based on proffers from M.M., the IHO determined that the McCarton report contained analysis and recommendations for C.M.'s future education, but was not probative of the relevant issue, which was what award of compensatory education would remedy C.M.'s past denials of a FAPE. (See IHO Hearing Transcript, September 8, 2014 at 864-65.) Thus, the report was excluded both because it was cumulative of other evidence from experts regarding how to best educate C.M. in the future, (see id. at 868), as well as not probative of the relevant issue of compensatory education, (see id. at 869). Both the IHO and SRO effectively ruled that the McCarton report was not needed to decide the issue of compensatory education. The IHO's, and even more so, the SRO's, evaluation of this evidence is entitled to deference. The Court finds no basis to disturb the conclusion of the IHO and SRO that the McCarton report and testimony was not needed to properly calculate C.M.'s compensatory education award.

M.M. further alleges that the IHO and SRO failed to consider other admissible evidence, (Pl.'s Opp. at 34), and improperly narrowed the scope of admissible evidence in the administrative record, (id. at 35). M.M. additionally alleges that the IHO "applied the wrong legal analysis, erroneously narrowed the issues in the hearing, failed to permit testimonial and documentary evidence to be introduced that was relevant to the claims and defenses and then ruled on defenses in his decision that were not raised below and/or concerning which M.M. had no notice." (Id.)

These additional claims lack merit. The SRO's decision, which is entitled to

14

deference, found that:

> After examining the hearing record and in light of the broad discretion granted to IHOs in conducting an impartial hearing, the IHO did not improperly restrict the scope or content area of questioning by counsel for the parent. Rather, the IHO provided counsel with leeway in discussing matters outside the scope of the due process complaint notice and appropriately exercised his discretion to curtail the lengthy proceedings by reasonably restricting counsel's repeated attempts to impermissibly expand the scope of the impartial hearing, appropriately discussing evidentiary matters regarding the relevance of proposed testimony, and instructing counsel for the parent to question witnesses in a manner that would result in the development of an adequate hearing record."

(SRO Dec. at 8.)  The IHO acted within his authority and the SRO properly upheld these

actions.

## II.   The Compensatory Education Award.

### A.   ABA Services.

The SRO awarded compensatory education to C.M. to remedy defendants'

failure to provide her a FAPE for the 2013-2014 SY.  This award included 1 hour of 1:1

ABA services for each day in the 2013-2014 12-month school year, for a total of 210 hours,

to be used by October 31, 2015.  (SRO Dec. at 13.)  The ABA award included the 180 day

school year and 30 days during the summer portion of the 12-month school year, but not

every week of the summer when school is not in session.  (Id. at 13 n.13.)  M.M. contends

that the SRO's award of additional ABA services was insufficient to compensate C.M. for

the 2013-2014 FAPE deprivation, arguing that 35 hours per week were required.  (Pl.'s Opp.

at 11.)  M.M. further argues that the SRO erred in not awarding sufficient ESY services to

C.M.  (Id. at 18-19.)

The SRO applied the correct legal standard: "[i]n determining appropriate

15

relief, the compensatory services should place the student in the position she would have occupied had the district complied with its obligations under the IDEA." (SRO Dec. at 13.) The determination regarding what position C.M. would have been in had she been provided a FAPE during the 2013-2014 SY was made more challenging by the fact that during the 2013-2014 SY C.M. received ABA services pursuant to the ABA Bank as part of the prior settlement agreement. (See id.) This circumstance "mudd[ied] the waters" (plaintiff's words) with respect to the determination of whether the progress C.M. made that year was a result of services provided pursuant to the IEP or pursuant to the ABA Bank. (Id. at 13 n.12.) In other words, a prediction regarding how far C.M. would have progressed with an IEP that provided a FAPE needed to be separated from progress that C.M. made as a result of using ABA Bank services, which were not part of the services provided to her in order to achieve a FAPE for that year, but were to remedy past FAPE deprivations. The SRO found that as the hearing record lacked "sufficiently quantifiable proof of the student's progress in relation to the number of ABA hours the student received," compensatory education of 1 hour of ABA services for each day in the 2013-2014 SY, totaling 210 hours, would be awarded. (Id. at 13.)

In circumstances such as this, where difficult evaluations need be made to distinguish which specific services are responsible for a student's progress, deference to an SRO's expertise is especially appropriate. While the SRO's determination that the compensatory education award is sufficient to place C.M. in the position she would have been in but for her denial of a FAPE for the 2013-2014 SY is entitled to deference based on the SRO's expertise in the field of education, the Court notes that the law of diminishing returns further supports this determination. Common sense and experience teaches that

services that may be valuable for, or even critical to, a child's educational achievement when provided in small to moderate amounts may become close to useless, or even burdensome, if provided in overwhelming quantity.  As the SRO noted in the context of awarding home-based services, "it is going to become increasingly difficult for the student to make up missed services from past deprivations and maintain a current program at the same time . . . ."  (Id. at 14.)  ABA services may be important, but as with all things, they are not an unmitigated benefit in any amount.  The SRO's educational judgement in taking account of C.M.'s overall educational setting, needs, and services, rather than rotely prescribing services from which the student would achieve no meaningful benefit, is entitled to deference.  The Court declines to disturbed the SRO's judgment that an overdose of services would be "increasingly difficult" and have a detrimental impact on the child who is endeavoring to "maintain a current program."  Id.

       The SRO's denial of M.M.'s requested ESY services was also proper.  ESY services are required only to the extent necessary "to prevent substantial regression," T.M. v. Cornwall Cent. Sch. Dist., 752 F. 3d 145, 152 (2d Cir. 2014) (quoting 8 NYCRR § 200.6(k)(1)(v)); see also id. at 163 (citing 34 C.F.R. § 300.106(a)(1)), defined as the "student's inability to maintain developmental levels due to a loss of skill or knowledge during the months of July and August of such severity as to require an inordinate period of review at the beginning of the school year to reestablish and maintain IEP goals and objectives mastered at the end of the previous school year."  8 NYCRR 200.1(aaa).  The SRO found that "[t]he hearing record is devoid of evidence that the student experienced such severe regression as to be eligible not only for 12-month services, but for services provided every week of the year."  (SRO Dec. at 13 n.13.)

The well-reasoned SRO decision is entitled to deference, and the Court finds that the SRO's compensatory education award of 1 hour of 1:1 ABA services for each day in the 2013-2014 12-month school year, for a total of 210 hours, to be reasonably calculated to put C.M. in the position she would have been in had she been provided a FAPE in the first instance.

B.     Parent Training and Counseling.

The SRO awarded 24 hours of compensatory parent training and counseling, to be used by October 31, 2015. (Id. at 11.) M.M. seeks an award of substantially more parent training and counseling. (Pl.'s Opp. at 18; SRO Dec. at 11. n.10.) The SRO's award was appropriate. The SRO found that "the hearing record contains no evidence indicating a need for, and [M.M.] presents no argument regarding why, such a high level of services provided to the parent is necessary to remediate the harm caused to the student by the district's failure to provide such services . . . ." Further supporting the SRO's decision was evidence in the record that one of C.M.'s home-based ABA providers had already discussed C.M.'s program with M.M. (SRO Dec. at 11. n.10.)

The SRO is in a much better position than the Court to determine the appropriate amount of parent training and counseling required to put C.M. in the position she would be in had she not been denied a FAPE. The well-reasoned SRO decision is entitled to deference, and the Court finds that the award of 24 hours of compensatory parent training and counseling to be reasonably calculated to put C.M. in the position she would have been in had she been provided a FAPE in the first instance.

C.      Assistive Technology.

The SRO award of compensatory education did not include any assistive technology.  (Id. at 10-11 n.9.)  The SRO reasoned that "[s]tate regulations provide that assistive technology devices and services are generally required to the extent necessary to permit a student to benefit from instruction," thus "a compensatory award of assistive technology services will be granted only when the services are necessary to assist the student in accessing the instructional portions of her compensatory award."  (Id. (citing 8 NYCRR 200.4(d)(2)(v)(b)(6), (d)(3)(v)).)  The SRO properly stated the applicable law.

There was evidence in the record recommending assistive technology as additional support for C.M., but the SRO found that while assistive technology might support and reinforce C.M.'s practice of academic skills, it was not a service required for C.M. to access her curriculum, and thus "the hearing record [did] not indicate that assistive technology devices or services [were] required to enable the student to receive benefits from the compensatory services awarded . . . ."  (Id.)  This analysis is entitled to deference and the Court declines to overturn the SRO's decision on this matter.

M.M. argues that "the SRO applied the wrong standard in holding that M.M. had to prove that C.M. required [assistive technology] to benefit from another aspect of her compensatory award," (Pl.'s Opp. at 20), contending that assistive technology, standing alone, can be "special education" in its own right, and need not be tied to other services, (id. (quoting 34 C.F.R. §300.105)).  However, M.M.'s argument is undercut by the language of 34 C.F.R. §300.105, which specifically indicates that assistive technology must be "made available to a child with a disability if required as part of the child's" special education, related services, or supplementary aids and services.  This language supports the SRO's

ruling that assistive technology is not itself an appropriate award of compensatory education, but rather, is appropriately included as a supplement when necessary to implement the awarded compensatory education.

> D.  Modification of C.M.'s June 2013 IEP.

As additional relief for C.M.'s denial of a FAPE during the 2013-2014 SY, M.M. requests a declaration that C.M.'s IEP for the 2013-2014 SY include "placement in the LRE, an appropriate ESY program, ABA, 1:1 instruction, after-school services, [assistive technology] and her related services."  (Pl.'s Rev. Mem. in Supp. of Summ. J., August 29, 2016, Dkt. No. 68 ("Pl.'s Supp.") at 23.)  She further requests an injunction directing the creation of a legally valid IEP that complies with the IDEA's procedural requirements, "is free from illegal policies and restrictions[,] includes all services required to afford C.M. a FAPE in the LRE[,] and [] is properly individualized."  (Pl.'s Opp. at 21.)

The SRO held these claims to be moot, finding that the 2012-2013 SY having expired, the dispute no longer addressed the then current needs of C.M.  (See SRO Dec. at 9.)  While M.M. argues that these claims are not moot because their resolution could affect whether C.M. receives a FAPE in the future, she does not explain how the Court retroactively amending a past IEP would so affect C.M.'s future provision of a FAPE.  The one case that M.M. cites in support of her contentions, Student X v. New York City Dept. of Educ., 2008 U.S. Dist. LEXIS 88163, at *28 (E.D.N.Y. Oct. 30, 2008), is distinguishable.  In that case, the court found that the development of a more recent, substantially identical IEP did not moot a challenge to an identical IEP developed several months earlier for the same school year.  Id. at 35, 42.  But the SRO in this case has issued an order regarding a subsequent IEP, which is the subject of the litigation before this Court.  Having

acknowledged the repeated methodological disputes between M.M. and defendants over

C.M.'s past IEPs, the SRO ordered that:

> [W]hen the CSE next convenes to conduct an annual review of
> the student's program the district will be directed to consider
> whether home-based educational services, the provision of
> instruction using ABA methodology, or assistive technology
> devices and services are required to enable the student to
> benefit from instruction and, after due consideration thereof,
> provide the parent with prior written notice on the form
> prescribed by the Commissioner specifically indicating
> whether the CSE recommended or refused to recommend such
> services on the student's IEP and explaining the basis for the
> CSE's recommendation therein as well as the evaluative
> information relied upon in reaching these determinations.

(SRO Dec. at 14.)

M.M. alleges that defendants failed to implement this order.  (Second

Amended Complaint ("SAC") ¶ 366.)  The SRO order, and further orders from this Court

ordering its enforcement, if necessary, negate any need for retroactive amendment of the

June 2013 IEP.

III. C.M.'s Stay-Put Rights and Implementation of the SRO Order.

M.M.'s allegations that defendants violated C.M.'s stay-put rights and failed

to implement the SRO order were not addressed at the prior administrative proceedings.  Due

to an inadequately developed record, the Court denies both parties' summary judgement

motions with respect to these claims.

A.      C.M.'s Stay-Put Rights.

"The stay-put provision of the IDEA provides that 'during the pendency of

any proceedings conducted pursuant to this section, unless the State or local educational

agency and the parents otherwise agree, the child shall remain in the then-current educational

placement of the child.'"  E. Lyme Bd. of Educ., 790 F.3d at 452 (citing 20 U.S.C. §

1415(j)).  "To determine a child's 'then-current educational placement,' a court typically looks to: (1) 'the placement described in the child's most recently implemented IEP'; (2) 'the operative placement actually functioning at the time when the stay-put provision of the IDEA was invoked'; or (3) 'the placement at the time of the previously implemented IEP.'"  Id. (quoting Mackey ex rel. Thomas M. v. Bd. of Educ. for Arlington Central Sch. Dist., 386 F.3d 158, 163 (2d Cir. 2004)).

On August 15, 2013, a pendency hearing was held before IHO Roth to determine C.M.'s stay-put program and placement.  (Pl.'s 56.1 ¶ 48.)  On September 27, 2013, IHO Roth issued an interim order on pendency establishing M.M's stay-put rights. (Pl.'s 56.1 ¶ 49.)  The order concluded that the June 2012 IEP constituted C.M.'s stay-put placement for the 2013-2014 SY, and directed defendants to fund the 10 hours per week of SEIT/ABA included on the June 2012 IEP.  (Pl.'s 56.1 ¶¶ 55-56.)  Neither party appealed this order.  (Pl.'s 56.1 ¶ 57.)

M.M. first raises claims alleging violations of C.M.'s stay-put rights here, never having previously brought them at any administrative proceeding.  Neither the impartial hearing record nor the SRO decision address C.M.'s stay-put rights.  However, "'an action alleging violation of the stay-put provision falls within one, if not more, of the enumerated exceptions to' the IDEA's exhaustion requirement."  E. Lyme Bd. of Educ., 790 F.3d at 455 (quoting Murphy v. Arlington Central Sch. Dist. Bd. of Educ., 297 F.3d 195, 199 (2d Cir. 2002)).  The Court may thus not grant summary judgment against M.M. for failure to exhaust this claim.

The services that C.M. was due under her stay-put rights, and the services actually provided, are either disputed by the parties or not clear from the record.  Contrary to

the Court's reading of the SRO decision, defendants argue that the compensatory education awarded by the SRO was intended to remedy any violation of C.M.'s stay-put rights as well as her denial of a FAPE.  However, even if this were the case, the SRO decision awarding compensatory education was based upon the record created by the IHO at the impartial hearing, and the decision rejected the admission of any additional evidence on appeal.  (SRO Dec. at 8-9.)  Thus, even if the SRO award was intended to remedy defendants' violation of C.M.'s stay-put rights in addition to defendants' failure to provide C.M. with a FAPE, several of the alleged stay-put violations post-date the hearing and thus would not have been part of the record on appeal, including defendants' alleged failure to offer an ESY program in the summer of 2014, (Pl.'s 56.1 ¶ 236), C.M.'s school's alleged lack of a special education teacher during several months in 2014, (Pl.'s 56.1 ¶ 237), and defendants' alleged failure to provide C.M. with an ESY instructional program in the summer of 2015, (Pl.'s 56.1 ¶ 239).

The only evidence in the record regarding these deficiencies is an affidavit from M.M. stating as much.  (Hyman Decl., October 30, 2015, Dkt. No. 30 at Ex. R. (Decl. of M.M., October 30, 2015).)  Defendants concede that the "administrative record is silent with respect to this claim . . . ."  (Defs.' Mem. in Supp. and Opp. of Summ. J., September 12, 2016, Dkt. No. 78 ("Defs.' Supp.") at 16.)  It would be inappropriate for the Court to grant summary judgment to either party based on this record.  Both parties' motions for summary judgment with respect to defendants' alleged violation of C.M.'s stay-put rights are denied.

B.     Implementation of the SRO Order.

M.M. claims that defendants have violated the IDEA by failing to implement the SRO decision.  (SAC ¶ 366.)  Specifically, M.M. alleges that defendants did not implement the ABA or parent training that was awarded and failed to consider ABA and

home-based services or issue a Prior Written Notice, as ordered by the SRO.  (See Pl.'s

Supp. at 25; see also Decl. of M.M., October 30, 2015.)

Defendants contend that C.M. receives ABA therapy from a private provider,

that the DOE processes payments directly to the ABA provider upon receipt of payment

documentation, and that the DOE has not received any invoices for the compensatory hours

awarded by the SRO.  (Defs.' Supp. at 17-18.)  The primary evidence that defendants cite in

support of this contention is an email chain between M.M.'s counsel, the DOE's Impartial

Hearing Order Implementation Unit, and defendants' counsel.  (See Hyman Decl., October

30, 2015 at Ex. X.)

The information in the record is not sufficient for the Court to evaluate the

merits of these arguments.  Based on the evidence indicated by the parties, it is not clear

whether defendants' actions complied with the SRO decision.  Both parties' motions for

summary judgment with respect to defendants' alleged failure to implement the SRO order

are denied.

IV. Remaining Claims.

M.M. brings further claims under Section 504 and section 1983 for

defendants' failure to provide C.M. with a FAPE, and under Section 504, section 1983, and

the IDEA for defendants' alleged systemic violations of the IDEA.

M.M. brought claims under Section 504 in the 2013 Due Process Complaint,

but the IHO did not rule on them.  (SAC ¶ 316.)  M.M. appealed the IHO's failure to hear her

Section 504 claims to the SRO, and the SRO ruled that he did not have jurisdiction to review

Section 504 claims.  (SRO Dec. at 8.)  While M.M. appealed the IHO's alleged failure to rule

on her claims of systemic violations of the IDEA, the SRO found that "she raise[d] no

particularized arguments and it [was] not necessary to address them further given the district's concession that it did not offer the student a FAPE."  (Id. at 4 n.5.)

Based on this record it would be inappropriate for the Court to dismiss M.M.'s section 1983 or Section 504 claims, or their claims for systemic violations of the IDEA, for a failure to exhaust them.  To the extent that the SRO made findings relevant to these claims the Court will defer to the SRO's findings, for the reasons stated previously. Because of the lack of discovery or developed administrative record regarding issues not dealt with by the SRO, the Court evaluates the parties' motions for summary judgment with respect to those issues using the same standard as it would evaluate a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P.

Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In assessing the sufficiency of a complaint, a court must disregard legal conclusions, which are not entitled to the presumption of truth.  Id.  Instead, the Court must examine the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

Insofar as M.M. brings claims under Section 504 and section 1983 for defendants' failure to provide C.M. a FAPE, or for systemic violations of the IDEA, the SAC

fails to state a claim upon which relief can be granted, and those claims are dismissed.

A.      Section 504.

"Section 504 addresses discrimination against disabled students, rather than inappropriate special education services which can be the basis of IDEA claims." S.W. v. Warren, 528 F. Supp. 2d 282, 289 (S.D.N.Y. 2007).  "[A] Section 504 claim may be predicated on the claim that a disabled student was 'denied access to a free appropriate education, as compared to the free appropriate education non-disabled students receive.'" C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 841 (2d Cir. 2014) (quoting S.W., 528 F. Supp. at 290).

M.M.'s claims under Section 504 are premised on the same allegations underlying her arguments regarding compensatory education for defendants' failure to provide C.M. with a FAPE.  (See, e.g., SAC ¶ 347 ("C.M. requires ABA Services, home-based instruction and for M.M. to have home-based Parent Training in order for her to have equal access to and benefit from her right to education in New York State."); SAC ¶ 349 ("Defendants have discriminated and are discriminating against C.M. based on her disability by refusing to allow services that would enable her to gain equal benefit from education, compared to her typical peers."); SAC ¶ 352 ("By denying C.M. access to her 1:1 instruction, ABA services, after-school services, and [assistive technology], Defendants have discriminated and are discriminating against her based on her disability.")

To state a claim under Section 504, a plaintiff must allege (1) "that he or she is a person with disabilities under the Rehabilitation Act," (2) "who has been denied benefits of or excluded from participating in a federally funded program or special service," (3) "solely because of his or her disability." Bryant v. New York State Educ. Dep't, 692 F.3d

202, 216 (2d Cir. 2012).  At issue is the second prong: whether C.M. has been denied benefits or excluded from participating in a federally funded program or service by virtue of her denial of a FAPE or by systemic IDEA violations by defendants.

Additionally, a Section 504 claim predicated on the denial of a FAPE "requires proof of bad faith or gross misjudgment."  C.L., 744 F.3d at 841.  Courts have used this same standard to evaluate Section 504 claims alleging systemic IDEA violations as well.  See S.W., 528 F. Supp. 2d at 287, 290-92 (requiring proof of bad faith or gross misjudgment for Section 504 claims alleging systemic IDEA violations).

A plaintiff who alleges that they have been denied benefits or have been excluded from participating in a federally funded program or special service "may proceed under any or all of three theories: disparate treatment, disparate impact, and failure to make reasonable accommodation."  Regional Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48 (2d Cir. 2002).  M.M. is proceeding on the theory that defendants failed to make reasonable accommodations for C.M. by denying her a FAPE. (See Pl.'s Supp. at 27.)  M.M. thus fails to state a claim under Section 504, as "a demand for 'reasonable accommodations to assure access to an existing program' is cognizable; but a demand for 'additional or different substantive benefits' is not."  Streck v. Bd. of Educ., 280 F. App'x 66, 68 (2d Cir. 2008) (summary order) (citing Wright v. Giuliani, 230 F.3d 543, 548 (2d Cir. 2000) (per curiam)).  Because C.M was classified as a student with a disability and provided with an IEP, C.M. was afforded "access to an existing program."  Id. (citing Wright, 230 F.3d at 548.)  Because M.M "challenges the content and sufficiency of the IEP," she "demands additional or different substantive benefits," rather than "reasonable accommodations to assure access to an existing program."  Id. (internal quotation marks

omitted).  To the extent that M.M. alleges that C.M. is due services beyond that to afford her a FAPE, (SAC ¶ 354 ("Even if the services that M.M. seeks are not necessary to afford C.M. a FAPE under the IDEA, they are necessary to level the playing field and afford C.M. equal benefit to the state-mandated education guaranteed to each student in New York.")), she similarly improperly seeks additional or different substantive benefits under Section 504.

In any event, M.M. cannot show the requisite bad faith or gross misjudgment. While M.M. conclusory asserts that defendants' "conduct is knowing, intentional, reckless, and gross," (SAC ¶ 355), the IHO found that C.M. "received an inordinate amount of services during the 2013-2014 school year," (IHO Dec. at 15), and the SRO agreed that "the hearing record supports the IHO's determination that the student received a greater level of services than was necessary to provide her with a FAPE," (SRO Dec. at 12).  A technical FAPE deprivation when the student is provided with such services is not the result of bad faith or gross misjudgment.  The same applies to M.M.'s claims under Section 504 alleging systemic violations of the IDEA.  (SAC ¶ 350 ("Defendants have discriminated and are discriminating against C.M. based on her disability by refusing to allow her IEP teams to recommend services that would enable her to gain equal benefit from education, regardless of her individual needs."))  M.M.'s Section 504 claims are dismissed.

B.    Section 1983.

To state a claim under section 1983, a plaintiff must allege "(1) the violation of a right secured by the Constitution and laws of the United States, and (2) the alleged deprivation was committed by a person acting under color of state law."  Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 87-88 (2d Cir. 2015) (internal quotation marks omitted). "A state employee acting in his official capacity is acting under color of state law."  Id.

(internal quotation marks omitted).  M.M. alleges that defendants violated C.M.'s rights secured under the IDEA and the Fourteenth Amendment to the U.S. Constitution.

"The Fourteenth Amendment does not protect a public education as a substantive fundamental right."  Handberry v. Thompson, 446 F.3d 335, 352 (2d Cir. 2006). However, "the IDEA creates rights in favor of disabled children and their families enforceable through [section] 1983."  D.D. v. New York City Bd. of Educ., 465 F.3d 503, 511 n.10 (2d Cir. 2006).

It would be inappropriate for the Court to award additional compensatory education under section 1983 to remedy C.M.'s deprivation of a FAPE.  First, district courts within this circuit have suggested that an award of compensatory education is not available under section 1983.  See, e.g., Zahran v. Bd. of Educ., No. 03 cv 615, 2004 U.S. Dist. LEXIS 10244, at *9-10 (N.D.N.Y. June 4, 2004).

Second, the SRO determined that its award of compensatory education would remedy defendants' failure to provide C.M. with a FAPE.  M.M. has advanced no principled reason why or how a claim for compensatory education for a violation of the IDEA could stand side by side with an award of compensatory education given for the same alleged wrong and found to be adequate.  The Court is not aware of any case in which a plaintiff has, in effect, been compensated with compensatory education twice for the same FAPE deprivation: once under IDEA, and once under section 1983 for violations of IDEA.  This is not a case where a plaintiff seeks compensatory education under the IDEA and monetary relief under section 1983.

Neither is declaratory or injunctive relief available to M.M. under section 1983 in these circumstances: M.M. admits that she was granted, and participated in, both an

impartial hearing before and IHO and an appeal before an SRO.  See Streck, 280 F. App'x at 68 (upholding dismissal of claims under section 1983 where "[p]laintiffs fail[ed] to allege a denial of procedural safeguards or administrative remedies: they were afforded a hearing before an impartial hearing officer and review by a state review officer").  Because M.M. takes issue not with the process she received, but with the outcome of that process, she has failed to allege that she was deprived of any rights without due process.

        The same is true of M.M.'s allegations of systemic violations of the IDEA. See BD v. DeBuono, 130 F. Supp. 2d 401, 434 (S.D.N.Y. 2001).  In that case, faced with similar allegations regarding systemic IDEA violations stemming from a district "policy of strictly limiting the number of hours of ABA allowed any one child," id. at 418, the court dismissed the section 1983 claims of plaintiffs who had the opportunity to challenge their own IEP's provision of ABA hours, id. at 434.  The court reasoned that, while the IDEA provided individuals a property interest in a FAPE, that property interest was not impaired without due process when the parents had a meaningful opportunity to participate in the administrative review process:

> Policy or no policy, the deprivation at issue in this case, as plaintiffs themselves contend, is the failure to provide each child with an individualized education program.  Section 1983 liability arises if and only if this deprivation occurred without due process of law.  If any plaintiff received adequate due process relevant to this deprivation, his claims must be dismissed.

Id. at 432 (emphasis removed); see also S.W., 528 F. Supp. 2d at 287, 297-98 (S.D.N.Y. 2007) (dismissing plaintiffs' section 1983 claims alleging that defendants' various policies violated the IDEA because plaintiffs failed to allege that they pursued available administrative remedies).

C.      Systemic Violations of the IDEA.

M.M. brings claims under Section 504, section 1983, and the IDEA for systemic violations of the IDEA.  While M.M.'s claims under Section 504 and section 1983 fail for the reasons stated above, M.M.'s allegations regarding systemic violations of the IDEA independently fail to state a claim under any of the three statutes.

First, M.M. challenges defendants' policies related to the provision of ESY services and the LRE mandate, alleging that defendants have systemically violated the IDEA. (See SAC ¶¶ 358, 372, 373, 375.)  M.M. alleges that the only ESY services considered for C.M.'s IEPs are standard 6 week ESY services during the summer months in segregated settings, that is, self-contained special education classrooms with no nondisabled students. (See Pl.'s Supp. at 29.)  M.M. alleges that "IEP teams are constrained to offer six weeks of ESY services and a 46 week school year for every special education student in New York City," (SAC ¶ 244), and that "[d]efendants' IEP teams were unable to consider individualized ESY services outside of District 75," (SAC ¶ 314(d)).

The Second Circuit's holding in T.M. is instructive and controlling.  752 F.3d at 161-68.  In that case, the court found that a district that provided no ESY services for non-special education students, and thus only provided IEPs with segregated ESY placements, had violated the LRE mandate under the IDEA.  The court reasoned that, to meet the IDEA's LRE requirement with respect to ESY placements, "a school district first must consider an appropriate continuum of alternative placements; it then must offer the disabled student the least restrictive placement from that continuum that is appropriate for his or her needs."  Id. at 165.  This requirement is not avoided where a district does not offer certain types of educational environments.  Id.  Yet, "a school district need not itself operate all of the

different educational programs on this continuum of alternative placements.  The continuum may instead include free public placements at educational programs operated by other entities, including other public agencies or private schools."  Id.  Assuming the truth of M.M.'s allegations it appears that defendants' practice of only providing segregated ESY placements violates the LRE provision of the IDEA.

However, the Second Circuit in T.M. emphasized that "the IDEA does not require public school districts to create any new ESY programs that they do not currently operate."  Id. at 166.  Further, the remedy for a districts' failure to provide a student with an ESY program in the LRE is for the district to reimburse that student for the cost of an appropriate alternative placement.  See id. at 166-67.  The Second Circuit did not contemplate injunctive relief as a remedy for violations of the ESY LRE mandate:

> Each school district thus has broad discretion over how it structures its alternative ESY placements; it can choose to operate its own educational ESY programs, or to offer the disabled children alternative placements in outside programs. But if a school district simply refuses to consider a sufficient continuum of possible ESY placements, and thereby denies a child a FAPE in his or her LRE, then it may be liable for reimbursement if the child's parents find an appropriate alternative placement.

Id. at 166.  Further,

> Even if a school district fails to place a disabled student in an ESY program in his LRE, the student still will not be entitled to reimbursement unless he finds a private alternative ESY placement, proves that alternative placement was appropriate, and proves that equitable considerations favor reimbursement. If no appropriate alternative ESY placements are available, the school district need not fear reimbursement claims.

Id. at 167 (internal citation omitted).

The Second Circuit precedent is clear: for a student who has been denied an

ESY placement in his or her LRE, his or her only remedy is reimbursement for a private alternative placement, and then only if he or she can find one.  M.M. does not allege that C.M. was enrolled in a private alternative placement and does not seek reimbursement.  She thus fails to state a claim upon which relief can be granted with respect to her allegation that defendants have systemically violated the IDEA by failing to provide ESY placements in the LRE.

M.M. also alleges that defendants have systemically violated the LRE mandates of the IDEA and Section 504, which, she alleges, require "a continuum of alternative placements and services available to meet the needs of students with disabilities," through a policy by which "IEP teams in her district are limited in the types of services that they have available via the IEP process to facilitate a program and placement in the LRE." (Pl.'s Supp. at 30; see also SAC ¶ 348 ("Defendants have discriminated and are discriminating against C.M. based on her disability by refusing to allow certain services to be recommended on her IEP regardless of her individual needs."); SAC ¶ 358 ("Defendants have violated the IDEA by adopting, applying, and directing the application of blanket policies, practices, and procedures to C.M.'s IEPs and placements in relation to ESY services, the LRE mandate and limitations on the availability of IDEA-mandated programs and supports as otherwise alleged herein."); SAC ¶ 361 ("Defendants have violated the rights of Plaintiff under the IDEA by making decisions about C.M.'s IEP and placement based upon administrative and financial concerns rather than her individual needs."); SAC ¶ 362 ("Defendants have violated the IDEA by predetermining the outcomes of C.M.'s IEPs.").)

Specifically, M.M. alleges that "her only options for C.M. are either a 12:1:1 class in a community school with a paraprofessional . . . or a segregated classroom in District

75."  (Pl.'s Supp. at 31.)  However, M.M. has cited no case or regulation suggesting that these options are insufficient to meet the LRE standards of the IDEA or Section 504.

Lastly, M.M. argues that defendants' policies concerning parent training violate the IDEA.  (Id. at 32.)  M.M. alleges that defendants' fail to individualize recommendations of parent training, and that when offered, it is "in a boilerplate one-size-fits-all fashion - once per week, in a group, for five weeks in a library or separate location." (Id. at 32.)  M.M. does not specify how the parent training was deficient other than that it was not individualized.  M.M. cites no authority suggesting the parent training she received was inadequate.

For the reasons explained, M.M. has failed to state a claim for systemic violations of the IDEA under that statute, section 1983, or Section 504.  M.M's arguments regarding the submission of additional evidence, (Pl.'s Opp. at 32-33), are thus moot. Defendants' motion for summary judgment is granted with respect to M.M.'s section 1983 and 504 claims, and claims for systemic violations of the IDEA, and those claims are dismissed.

V.   State Law Claims.

M.M. also alleges that "Defendants have violated Plaintiff's rights under [the] New York Constitution, the New York State Education Law §§ 3202, 3203, 4401, 4404 and 4410 and § 200 of the Regulations of the New York State Commissioner of Education, 8 N.Y.C.R.R. §200, et seq."  (SAC ¶ 379.)  M.M. alleges no facts supporting this allegation and neither party specifically addresses these claims in their submissions.  Defendants' motion for summary judgment with respect to M.M.'s state law claims is thus granted, and M.M.'s motion for summary judgment with respect to these claims is denied.

CONCLUSION

Plaintiff's motion for summary judgment (Dkt. No. 66) is denied. Because the record is insufficient to determine whether defendants have violated C.M.'s stay-put rights under the IDEA or failed to enforce the SRO's March 26, 2015 order, defendants' motion for summary judgment (Dkt. No. 76) is denied with respect to those two claims and granted in all other respects.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
March 30, 2017